TAYLOR et al. v. LAFEVERS.   (No. 1824.)

(Court of Civil Appeals of Texas. Texarkana. July 12, 1917. On Motion for Rehearing Oct. 4, 1917.)

1. TRIAL ⬅⮞ 343—VERDICT ON CONFLICTING EVIDENCE—EFFECT.

A verdict settles conflicts in the evidence in favor of the successful party.

2. CONTRACTS ⬅⮞130—CONSIDERATION—ILLEGALITY OF CONTRACT.

While an agreement to refrain from bidding at a judicial sale in order to suppress competition is illegal, the mere fact that several combine to purchase property offered at a judicial sale does not, of itself, amount to such fraud as to render the contract unenforceable between the parties; and hence, where the property of a bankrupt was first offered for sale in three different classes and then offered in its entirety to any person who would raise the three highest separate bids for the property, an agreement that defendant should purchase the whole of the property and would sell to plaintiff the notes and accounts of the bankrupt for the amount of plaintiff's previous bid therefor, which was the highest for that class of property, is not, though coupled with an agreement that plaintiff should not participate in subsequent bidding, open to

attack on the ground of illegality of consideration, where plaintiff desired none of the other property, and there was no fraud.

3. EVIDENCE ⬅⮞142(1) — MARKET VALUE — SALE OF OTHER PROPERTY.

Proof that other notes and accounts belonging to bankrupt estates had been sold in that territory does not, in an action for breach of an agreement to transfer to plaintiff notes and accounts of a bankrupt purchased by defendant, establish any market value for such property, for that showed no market value for the actual notes and accounts involved.

4. SALES ⬅⮞384(1) — CONTRACTS — BREACH — MEASURE OF DAMAGES.

Where defendant, who bought in the entire property of a bankrupt, broke an agreement to transfer to plaintiff the notes and accounts of the bankrupt, plaintiff's measure of damage is the difference between the amount he agreed to pay and the reasonable value of such property, and its market value cannot be taken as the criterion, for such class of property has no market, as in the case of ordinary chattels, for its value depends on the solvency and honesty of the debtors and makers of the negotiable instruments.

5. TRIAL ⬅⮞272—INSTRUCTIONS—WAIVER OF OBJECTIONS.

Where there was no objection to the submission of the issue of conversion, an instruction defining conversion is not ground for objection.

On Motion for Rehearing.

6. SALES ⬅⮞388 — ACTIONS — BREACH — INSTRUCTIONS.

Plaintiff and defendants were bidders at the sale of property of a bankrupt. The property was first divided into three classes, and bids submitted on each class. Plaintiff's bid for the notes and accounts was the highest. Thereupon, the trustee having offered the entire property to any one who would bid more than the amount of the three highest separate bids, defendant agreed, in event of purchasing the property, to transfer to plaintiff the notes and accounts for the amount of his bid, and plaintiff agreed to refrain from further bidding. *Held,* that in an action for defendant's breach of contract, defendant having bid in the whole of the property, requested charges that if the contract had a tendency to suppress competition in bidding, verdict should be for defendant, though requiring a finding that it was the purpose of the parties to suppress competition, were properly refused; the contract not necessarily being invalid despite such purpose.

Appeal from District Court, McLennan County; Tom L. McCullough, Judge.

Action by J. M. Lafevers against P. G. Taylor and others. From a judgment for plaintiff, defendants appeal. Affirmed.

Neff & Taylor, of Waco, and Chas. L. Black, of Austin, for appellants. Alva Bryan, Cross & Rogers, and Chas. B. Braun, all of Waco, for appellee.

HODGES, J. This suit was filed by the appellee, Lafevers, in the court below against P. G. Taylor and the Taylor-Hanna-James Company, a private corporation, to recover the sum of $4,292.65 as actual and $5,000 as exemplary damages for the breach of a contract for the sale of a number of notes and accounts, and in the alternative for their conversion. The evidence shows that the Elk Mercantile Company, doing business in

the town of Elk in McLennan county, had filed a petition in bankruptcy, and John Maxwell had been appointed a trustee of the bankrupt estate, which consisted of a stock of goods, store fixtures, and certain notes and accounts. On January 16, 1915, the trustee offered this property for sale at public auction. He separated the estate into three classes, one consisting of the stock of goods, another the store fixtures, and a third of the notes and accounts. He took bids on each of these classes separately. He then added the three highest bids together, and offered the entire lot to any person who would raise the sum of those bids. It also appears from the evidence that when the notes and accounts were offered separately, the appellee had bid $900, the highest price offered for that class. He alleged in his petition that after separate bids were made, and before the sale was completed, he had an understanding and agreement with P. G. Taylor, who then represented the Taylor-Hanna-James Company, that he (Taylor), in the event he purchased the property, would sell the notes and accounts to the appellee for the sum 'of $900. The petition consisted of two counts: The first charged, in substance, that P. G. Taylor, acting for the defendant corporation, agreed with the plaintiff to act as his agent at the bankrupt sale, and in that capacity to buy the notes and accounts for the plaintiff for the sum of $900; the other that the defendants and the plaintiff entered into a contract whereby the defendants agreed that if they were successful bidders at such sale, they would sell him the notes and accounts for the sum of $900. A trial before a jury resulted in a judgment in favor of the appellee against P. G. Taylor and the Taylor-Hanna-James Company jointly for the sum of $2,183.24 as actual damages. This amount is presumably the value of the notes and accounts, less the sum of $900 which the appellee agreed to pay. It is undisputed that P. G. Taylor purchased the goods at the sale and afterwards refused to convey the notes and accounts to the appellee according to the agreement which the appellee alleged was made. The evidence was conflicting as to the existence of any contract between the appellee and P. G. Taylor by which the latter agreed, in the event he was the successful bidder, to sell the notes and accounts to the appellee for $900. Taylor testified that there was no such agreement. The following is the version given by the appellee:

"Just as Maxwell started the bids on the entire stock and fixtures and the accounts and notes together, Mr. Taylor came over to me where I was sitting, and pushed me on the shoulder and said, 'I want to speak to you.' We walked to the front end of the store, and Mr. Taylor wanted to know if I would give $900 for the accounts. I said, 'I will.' He said, 'Now, if you will stay out of the bidding I will bid the whole thing in with the understanding that you have the accounts;' and I was to have the accounts for $900. I said, 'I will do that; I will stay out with the understanding that you buy the accounts for me;' and he said he would. We walked back, and that about ended the conversation; and Mr. Taylor went ahead with the bidding, and I didn't bid another time."

[1] The verdict of the jury settled the conflict in the evidence in the appellee's favor.

[2] The first and principal defense urged in this appeal is that the contract relied on is void for the reason that it is based upon an illegal consideration, a promise to refrain from bidding at a public judicial sale. While the court submitted the case to the jury upon both counts in the petition, we think the testimony, properly construed, shows only an agreement by which Taylor bound himself and his principal, in the event he was successful bidder, to sell the notes and accounts to the appellee for $900, and the latter bound himself to take them 'at that price. It may fairly be assumed that it was contemplated by the appellee and Taylor that the latter was to buy the entire property then being offered for sale, pay for it from the funds of his company, and then assign a part of it—the notes and accounts —to the appellee. The right of the appellee to demand the delivery of the notes and accounts after their purchase would depend upon his tender of payment according to the terms of his contract. Taylor was therefore acting as the agent of his company, and not for the appellee. But inasmuch as under the facts the measure of damages would be practically the same upon either theory of the plaintiff's case, there was no reversible error in the charge on conversion.

Treating this transaction as one for the breach of a contract, the question is, Was it based upon an illegal consideration? That an agreement to refrain from bidding at a judicial sale in order to suppress competition and enable the contracting parties to make purchases at a reduced price is illegal and unenforceable is too well settled to now require the citation of authorities. Courts refuse to enforce contracts of that kind because they are founded upon a consideration which involves the perpetration of a wrong by taking an unfair advantage of those who resort to public auctions for disposing of their property. But it is not every transaction which has the effect of suppressing competition that is subject to that particular objection. Courts now seem to look to the intent of the parties in making such agreements rather than solely to the practical consequences which follow, and hold that the mere fact that a competitive bidder is eliminated is not alone sufficient to annul such contract. See cases collated in notes of Coal & Coke Ry. Co. v. Marple, 38 L. R. A. (N. S.) 720. The author of the above notes says:

"The authorities all agree that a contract entered into by several persons under which one of them is to purchase property at public sale for the benefit of all the parties is void as against public policy, and is ground for setting the sale aside where it appears that it was made to prevent competition at the sale or for any

other fraudulent purpose. But the great majority of the cases hold that the mere combination does not, of itself, amount to such fraud as to render the contract unenforceable as between the parties or to constitute grounds to set aside the sale."

As supporting this statement of the law we may refer to the following cases as particularly applicable: James v. Fulcrod, 5 Tex. 513, 55 Am. Dec. 743; Hopkins v. Ensign, 122 N. Y. 144, 25 N. E. 306, 9 L. R. A. 731; De Baun v. Brand, 61 N. J. Law, 625, 41 Atl. 958; Jenkins v. Frink, 30 Cal. 586, 89 Am. Dec. 134; Wicker v. Hoppock, 6 Wall. 94, 18 L. Ed. 752; Venner v. Denver Union Water Co., 40 Colo. 212, 90 Pac. 623, 122 Am. St. Rep. 1055; 2 Elliott on Contracts, §§ 760, 761, and notes.

The record before us shows that appellee agreed to take the notes and accounts at a fixed price when purchased by Taylor. It appears that these were the only articles then being offered for sale which the appellee desired to purchase. In order to get them under the mode of sale adopted he was required to either buy all of the bankrupt property or to make an arrangement similar to the one he says he did make. It seems to be conceded that the appellee and Taylor might legally have agreed that one of them would refrain from bidding with the understanding that the other should purchase for their joint benefit all of the property then being offered. We can see no material difference in principle between that kind of an agreement and the one here assailed. The fact that the parties are to have specific portions of the property purchased would be no more offensive to the law than if they were to own it all in common. The vice, if any, in such an agreement lies, not in the terms of dividing the property, but in the stipulation that only one should bid for it. It cannot be said as a matter of law that appellee's agreement to take the notes and accounts instead of an undivided interest in the entire property is alone sufficient to vitiate the agreement. The law should be as much concerned in promoting the legitimate rights of the bidder as in protecting those of the parties interested in the property being sold. Its policy is to discourage compacts which are designed to secure an illegitimate and unfair advantage by buying off competition. In the case of Hopkins v. Ensign the court said, in discussing this character of contract:

"When such an agreement is made for the purpose and with the view of preventing fair competition and by reason of want of bidders to depress the price of the article offered for sale below the fair market value, it will be illegal, and may be avoided as between the parties as a fraud upon the rights of the vendor; but, on the other hand, if the arrangement is entered into from no such fraudulent purpose, but for the mutual convenience of the parties and for a reasonable and honest purpose, such agreement will be valid and binding."

The same court, quoting from an opinion by Justice Swayne in Wicker v. Hoppock, continues:

"The validity of such an arrangement depends upon the intention by which the parties are animated and the object sought to be accomplished. If the object be fair—if there be no indirection—no purpose to prevent the competition of bidders, and such is not the necessary effect of the arrangement in a way contrary to public policy, the agreement is unobjectionable and will be sustained."

The court, continuing, uses this language:

"The courts will now look to the intention of the parties, and if that be fair and honest, and the primary purpose be not to suppress competition, but to protect their own rights, and there be no fraudulent purpose to injure or defraud others interested in the result of the sale, the agreement may be upheld. The question is one of fact to be determined by the trial court upon the evidence before it."

In the case of Wicker v. Hoppock, before referred to, Justice Swayne, referring to a leading case, says:

"In one of the cases to which our attention has been called there was an agreement between two persons that one of them only should bid, and that, after buying the property, he should sell a part of it to the other upon such terms as the witnesses to the agreement should decide to be just and reasonable."

In the case of James v. Fulcrod a tract of land was being sold at public outcry. The parties entered into an agreement by which only one was to bid for the entire property, with the understanding that it was to be divided between them afterwards. The court held that such a contract was not against public policy, and said, among other things:

"The law does not require that all who attend at public auctions should bid for all or any of the articles exposed to sale. Were this the case, bidders might be subject to the most ruinous sacrifices to promote the interest of the vendors. They may abstain from action if it be their pleasure or conduce to their advantage. But should they act, they cannot be required to purchase in any other mode or on any other terms than may be advantageous to their own interest—they cannot be permitted to enter into combinations to stifle competition with the design of purchasing property at less than its fair value; but they may unite in any such number as may be necessary to make the purchase advantageous to themselves—provided this junction of interest be without any dishonest motives or injurious consequences."

Under the authorities referred to we think the contract here under consideration was not subject to the objections urged.

The appellants requested two special charges, both of which were refused by the court, and we think properly so. In each of them the jury were told that if the contract had the tendency to suppress competition in bidding, to find for the defendants. As we have seen from the cases discussed, that tendency alone is not sufficient to vitiate such agreements.

[3] On the measure of damages the court charged the jury that if they found for the plaintiff, to assess his damages at such an amount as would compensate him for the damages suffered, and that in arriving at

such sum, they should take into consideration the reasonable value of the notes and accounts on January 16, 1915, together with 6 per cent. interest per annum therefrom after deducting the sum of $900. Appellants objected to this charge upon the ground that it did not furnish the proper measure of damages, and requested the following, which was refused:

"You are instructed as a part of the law in this case that the measure of damages, if any, is the difference between the contract price, if any, of said notes and accounts and the market value of the same at the time and place of delivery of said notes and accounts."

The proposition urged under a group of assignments which follows is that the proper measure of damages in suits of this character is the market value of the notes and accounts at the time they were to be delivered. If this cause of action be treated as one for the breach of a contract to sell notes and accounts, the measure of the plaintiff's damages would be the difference between what he was to pay for them and the value of what he was to get. The only evidence introduced in the trial below tending to show that these notes and accounts had a market value was the testimony of witnesses, who based their conclusions that there was a market value upon the fact that other notes and accounts belonging to bankrupt estates had been sold in that trade territory. How often such sales had occurred, or whether the notes and accounts disposed of on such occasions were against the parties who owned these notes and accounts, did not appear. The fact that a note belongs to the estate of a bankrupt should no more affect its value than it would the value of the bankrupt's horses and cattle, or land. The evidence relied on was, we think, insufficient to show an established market for the particular notes and accounts involved in this litigation.

[4] In the case of horses and cattle, or stock and bonds having a commercial rating, and other articles of merchandise bought and sold daily in the open market, there is a similarity between the component units of each group which makes the value of some such articles furnish a correct criterion for estimating the value of others. But with evidences of indebtedness the situation is entirely different. One note may be worth its full face value, while others for an equal amount may not be worth 1 per cent. of that sum. The value in each instance must be determined, not alone by the face of the instrument, but by the solvency and honesty of the debtor; hence no one can tell the value of a debt without knowing something about the debtor. The fact that the note of one individual has sold upon some occasion in the past at a certain percentage of its value is no evidence of what another note against another debtor at a different time is worth. The fundamental purpose of all rules for fixing a measure of damages for the loss of property is compensation. Where the articles lost or injured were intended for sale in the open market, or when there is an established market where others of the same kind and quality may be procured, then the market value furnishes a fair and just standard for measuring the damages. But to resort to the market value when there is none, or when there is one that is not reliable, is not only confusing to the jury, but unfair to the injured party. In this instance the appellee was entitled to recover what he lost, and the amount he lost can be ascertained only by taking into consideration the face of the notes and accounts he contracted to purchase and the solvency and honesty of those who owed those debts. In addition to these they should also consider claims for credits and offsets, if any, which must be allowed upon a final settlement. These conditions are so diverse as to distinguish this class of instruments from other commodities whose value may be determined by a fixed market. Presumably the same conditions which determine the reasonable value of a debt would also fix what the debt would sell for in the market; hence there is little ground for assuming that the market value is less than what would be their reasonable value. If when tested by the market value the appellee would be required to take less than he would have realized from the purchase of the notes and accounts contracted for, the rule would not allow him compensation. When such conditions result courts will not apply a rule so manifestly unjust. We, therefore, conclude that the court submitted the proper measure of damages in this case. This disposes, not only of the objections to the charge, but the assignments based upon the refusal to give the special charge and the exclusion of certain evidence offered by the appellants.

[5] At the instance of the plaintiff the court gave a charge defining what constituted a conversion. This was objected to upon the ground that it submitted an issue not raised by the evidence, was upon the weight of the evidence, and was misleading and confusing. It appears from the general charge that the court submitted, without objection upon that ground, the issue of conversion. While we are of the opinion that there was no just basis for the submission of that theory of the appellee's cause of action, we also conclude that there was no reversible error in giving the abstract definition here complained of when no such objection was made against the concrete presentation of that theory in the court's main charge. The remaining assignments of error are without merit, and are overruled.

The judgment is affirmed.

### On Motion for Rehearing.

[6] It is earnestly insisted in appellants' motion for a rehearing that the special charges requested by them upon the issue of sup-

pressing competition in bidding at the sale have not been properly construed by this court in the original opinion. It is contended that the charges referred to not only required a finding that the contract between Taylor and Lafevers tended to suppress competition, but that such was the purpose of the parties. The language of the charge quoted in appellants' motion appears to justify that statement, but we do not regard that qualification as sufficient to make the charge, under the facts disclosed, a proper one. If, under such circumstances, the parties have a legal right to make a contract which logically tends to suppress competitive bidding, the fact that it was their purpose to accomplish that end is not, in every instance, sufficient to vitiate the contract. Let us suppose that in this case Taylor wanted only the stock of goods and the furniture and fixtures, and that Lafevers wanted only the notes and accounts. Under the plan adopted by the seller neither could get what he wanted without buying the entire bankrupt estate then offered for sale. The law is no more solicitous for the welfare of the seller under such circumstances than for that of the buyer. If the former by an arbitrary arrangement combines and offers for sale articles that may fairly and properly be separated without injury to their value, and thus compels the successful bidder to take all or none, he has no right to complain if two or more competitive bidders, in order for each to get only what he wants, agree upon a division which results in the elimination of one or more bidders. To require them, under the circumstances, to compete with one another would be to force them into a contest no less unfair to them than the fraudulent suppression of bids would ordinarily be to the seller. If bidders may lawfully agree that one only should bid for the entire property, the fact that they intend by that method to eliminate one bidder is no legal objection to the agreement. The mere existence of such a purpose, without any fraudulent design to gain an unfair advantage by a reduction of the purchase price, is not enough to avoid such an agreement upon grounds of public policy. In this particular instance the property had been divided into three lots, upon which separate bids were taken. It is not contended that it was not susceptible of that division; neither is there any intimation that the bids submitted upon the separate offerings were not fair and just. For some reason which is not made apparent the trustee refused to accept those separate bids, and grouped all of the property, requiring the successful bidder to raise the aggregate, thereby compelling him to take all of the property or none. The agreement upon the part of Lafevers to take the notes and accounts at a stipulated price and to refrain from bidding on the aggregate is not upon its face unfair. There was a minimum below which no bid would be entertained; and this arrangement may have caused Taylor to raise the aggregate to a sum greater than he otherwise would have given had he not been assured of a sale of the notes and accounts for a fixed sum. The case is wholly unlike one where the parties agree to share the property in common in pursuance of a scheme for securing an unfair advantage of the seller.

The special charges which it is claimed the court improperly refused were by their terms as applicable to a fair and legitimate agreement among the bidders as to one which may have had for its purpose the accomplishment of an unfair advantage. Under the facts of this case we think they were correctly refused.

The motion for a rehearing is overruled.